**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAINIE M. EMERY**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:08cv551 |
| | ) | **Electronic Filing** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY**, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

September 17, 2009

**I.    INTRODUCTION**

Lainie Emery, ("Plaintiff") brought this action pursuant to 42 U.S.C. §405(g) and 1383(c)(3), for review of the final determination of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.  As is the customary practice in the United States District Court for the Western District of Pennsylvania, the parties have submitted cross-motions for summary judgment based on the record developed at the administrative proceedings.

After careful consideration of the decision of the Administrative Law Judge ("ALJ"), the briefs of the parties and the entire administrative record, the Court finds that the decision of the Commissioner is not supported by substantial evidence.  Therefore, we will grant Plaintiff's motion for summary judgment, remand to the ALJ for further consideration as set forth below, and deny the Commissioner's motion for summary judgment.

**II.    PROCEDURAL HISTORY**

Plaintiff protectively filed for DIB and SSI on January 6, 2005, (R. at 40), alleging disability due to chronic pain, polycystic ovary disease, ovarian cysts, irritable bowel syndrome,

chronic back pain and migraines, (R. at 67), with an alleged onset date of February 1, 2001. (R. at 51).  Plaintiff's claims were initially denied by the state agency on April 5, 2005. (R. at 24). Plaintiff then filed a timely request for a hearing, (R. at 29), and a hearing was held before ALJ Douglas Cohen on January 5, 2007. (R. at 30, 386).  Plaintiff, who was represented by counsel, testified at the hearing before the ALJ. (R. at 386-87).  Additionally, the ALJ heard testimony of an impartial vocational expert. (R. at 386, 433-38).   On March 22, 2007, the ALJ issued a decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 16-22).  On February 20, 2008, the Appeals Council denied Plaintiff's request for review, (R. at 4-6, 9-10), making the ALJ's decision the final decision of the Commissioner.


**III.   STATEMENT OF THE CASE**

Plaintiff was born on July 24, 1969, making her thirty-seven years old at the time of the ALJ's decision. (R.at 40).  She testified at the administrative hearing that she attended high school until the twelfth grade and received a GED. (R. at 387).  Additionally, she was trained and licensed in cosmetology. (*Id.*).

Plaintiff's Work Background

At the time of the administrative hearing, Plaintiff had most recently worked as a printer space designer. (R. at 389).  She alleges that she became unable to work in this position on February 1, 2001. (R. at 51).  According to Plaintiff, her responsibilities in this position included configuring office space on a computer, invoice entry and taking care of shipping records. (R. at 389).  Plaintiff testified that this position was a desk job, which she took because it did not require her to lift heavy things. (R. at 389-90).  The position required her to lift five or less pounds at the most. (R. at 390).

Prior to her position as a printer space designer, Plaintiff was a retail manager at the Limited, Inc., (R. at 390-91), which required her to be on her feet all day. (R. at 391).  Plaintiff testified that, in this position, she was to lift boxes but avoided doing so because of her impairments. (Id.).  Consequently, she testified that she lifted no more than five pounds. (*Id.*). Prior to her position with Limited, Inc., Plaintiff was a salon manager. (R. at 392).  She testified

that this position required her to stand seven of eight hours in a day. (R. at 393).  She also testified that the job required no lifting. (*Id.*).  Prior to that position, Plaintiff was employed as a croupier (black jack dealer) in Las Vegas. (R. at 393-94).  In this position, Plaintiff testified that she would stand for six and half hours in an eight hour day. (R. at 394).  Additionally, Plaintiff testified that she has past work experience as a beautician. (*Id.*).   In this position, Plaintiff was required to stand for most of the day and lift less than five pounds. (R. at 395).  She also testified that she was a sales representative for an advertising company for a short period of time, which required lifting approximately fifteen pounds, as well as standing, sitting walking and driving. (R. at 395-96).  Prior to that position, Plaintiff worked as a shampooer in a salon, which required her to stand most of the day and lift five to ten pounds regularly. (R. at 396).

Plaintiff's Medical Background

At the administrative level, the ALJ was provided extensive medical records from Plaintiff's various treatment providers, including Dr. Jonathan Bekenstein, Jameson Rehabilitation Center, Ellwood City Hospital, Jameson Hospital, Lawrence County Family Medicine, Dr. Joseph Ciocca, Dr. Ronald Cramer and Dr. Robert Vandrak.

*Dr. Jonathan Bekenstein*

Plaintiff was seen by Dr. Bekenstein in October of 2002. (R. at 77).  Dr. Bekenstein noted at this time that Plaintiff had a history of ovarian cysts, cystectomy, right carpal tunnel release in August of 2002, a cyst in her throat, endometriosis and rare migraines. (R. at 78). After an evaluation, Dr. Bekenstein noted that Plaintiff had definite spasms in the sacral spine and possible neuropathic and abdominal pain. (R. at 79).  He also indicated that Plaintiff was suffering from sleep disturbance, likely as a result of major depression. (*Id.*).  Dr. Bekenstein reviewed plains films of the spine that Plaintiff brought with her. (*Id.*).  He indicated that these appeared to be normal. (*Id.*).  He prescribed Plaintiff Lexepro for anxiety and depression and Topomax for headaches. (*Id.*).  He also prescribed a pain medication, Baclofen, for back pain, as needed. (*Id.*).  He further suggested that Plaintiff taper off Vicodin and discussed the need for excellent sleep hygiene and regular exercise. (*Id.*).

Plaintiff was seen again by Dr. Bekenstein in November 2002 related to chronic back and pelvic pain. (R. at 75).  At this evaluation, Dr. Bekenstein noted that Plaintiff's mood and sleep had improved as a result of prescribed medications. (R. at 76).  He also noted that, following laparoscopic surgery for pelvic pain, she was prescribed an anti-depressant, Citalopram and Vicodin. (*Id.*).  Dr. Bekenstein suggested that Plaintiff begin and exercise program and attempt to taper off Vicodin. (*Id.*).  He noted that, if Plaintiff's pelvic pain could be controlled, he believed there was a better chance that Plaintiff would be able to get back to work and improve her mood. (*Id.*).

*Jameson Hospital*

On August 7, 2002, Plaintiff underwent outpatient median nerve decompression in her right hand for carpal tunnel syndrome. (R. at 197, 203).  According to the records, very good decompression was accomplished as a result of the procedure. (*Id.*).  Plaintiff was discharged with instructions to follow up in five days and with a prescription for Vicodin. (*Id.*).

Plaintiff was seen at the emergency at Jameson Hospital several times, generally with complaints of migraine headache or back and abdominal pain.  The medical records from these visits indicate that she was seen on July 27, 2002 and September 15, 2002 with complaints of migraine headache accompanied by nausea. (R. at 192-93, 213).  She was prescribed Demerol and Vistaril for  the migraine. (R. at 194-95, 215).  She was seen again on December 20, 2002 with complaints of a migraine headache. (R. at 186-87).  She was prescribed Toradal and Vicodin for pain. (R. at 187).

Plaintiff presented to the emergency room at Jameson Hospital on March 20, 2003, complaining that she hurt her arm and was experiencing pain from her hand to her shoulder. (R. at 168).   On examination, no bone or joint abnormality was found. (R. at 173).She was diagnosed with a contusion on the right hand and right shoulder strain. (R. at 170).  She was treated with Toradol and Lortab for pain and an ace bandage. (*Id.*).  She was also instructed to ice and elevate her hand and to keep her arm as active as possible. (R. at 172).  Plaintiff presented to the emergency room again on February 7, 2003 with complaints of a headache. (R.

at 177).  She was prescribed Imotrex, which she refused. (R. at 180).  She was also directed to rest. (R. at 179).

Records indicate that Plaintiff was admitted to Jameson Hospital on November 17, 2003. (R. at 97).  According to these records, Plaintiff had presented to the emergency room several times over the week prior to admission complaining of pain in her left side, back, left lower quadrant of her abdomen and pelvis. (*Id.*).  A CT scan was performed, which showed a questionable tiny kidney stone and some fluid, but was otherwise negative. (*Id.*; R. at 103). Additionally, a pelvic exam was performed, which was unremarkable. (*Id.*; R. at 101).  The records also indicate that Plaintiff was seen by a urologist, who did not believe a kidney stone was present. (*Id.*; R.at 99).  Plaintiff was started on antibiotics and saw improvement. (*Id.*).  An examination was done of Plaintiff again on November 19, 2003, which showed that Plaintiff was alert and did not appear to be under significant stress. (R. at 98).  The examining physician noted tenderness in her mid to lower thoracic spine region and tenderness in the lumbar region. (*Id.*). Plaintiff had a normal range of motion in the thoracic and lumbar spine, but complained of discomfort with flexion and side bending. (*Id.*).  The examining physician recommended moist heat as well as outpatient physical therapy for upper and lower back pain. (*Id.*).

Plaintiff was admitted to the emergency room on January 9, 2004 and March 21, 2004 complaining of pain and on May 4, 2004 for a toothache. (R. at 154-55).  Plaintiff was admitted to the emergency room again on June 10, 2004, complaining of side and abdominal pain. (R. at 142).  She was diagnosed as having a small uterine fibroid, (R. at 150), and prescribed Darvocet for pain. (R. at 149).  Records from Jameson Hospital indicate that Plaintiff was admitted to the emergency room again on October 3, 2004 and December 3, 2004 with complaints of back pain. (R. at 119-20). On both occasions she was prescribed oxycodone. (*Id.*; R. at 121).

On August 2 and 17, 2004, Plaintiff was seen at the emergency room, complaining of a migraine and vomiting. (R. at 125).  On August 2, she was diagnosed with a migraine and was prescribed Toradol and Phenergan for pain. (R. at 136).  On August 17, she asked for Demoral, but was prescribed Imitrex.  The records indicate that she was "not receptive to receiving an med [sic] other than Demoral." (R. at 128).  Plaintiff eloped from the emergency room. (R. at 129).

Dr. Robert Vandrak, D.O.[1]

Records from Dr. Vandrak indicate that Plaintiff had been treated for various symptoms regularly between 2002 and 2006, including chronic pelvic pain, back and neuropathic pain, fibromyalgia, irritable bowel syndrome and pain in the tailbone (coccydynia). (R. at 220-248). The earliest records from Dr. Vandrak indicate that Plaintiff was seen on March 14, 2002. (R. at 247). An MRI of the lumbar spine showed no evidence of disc herniation or spinal stenosis. (*Id.*). Additionally, an MRI of the thoracic spine was normal. (R. at 248).

Dr. Vandrak diagnosed Plaintiff with lumbar plexopathy (neuropathy of the lumbar spine), pain in the tailbone and the presence of ovarian cysts between April and June 2002. (R. at 238, 239 240, 246). A pelvic exam done in May 2002 showed no evidence of fracture or dislocation or destructive or erosive bone change. (R. at 244). Additionally, an ultrasound of the uterus was normal, but with noted presence of ovarian cysts. (R. at 246). There was no evidence of pelvic mass. (R. at 243). An MRI of the pelvis in May 2002 was normal. (*Id.*). Dr. Vandrak treated Plaintiff with Vicodin and Motrin for pain. (R. at 238-240).

Between August and December 2002, Dr. Vandrak's notes indicate that Plaintiff had good results with carpal tunnel release. (R. at 233-237). Additionally, Dr. Vandrak noted a diagnosis of fibromyalgia. (R. at 235). She was directed to take Advil and Aleve as needed. (R. at 235). Plaintiff was also prescribed medication for improved sleep, (R. at 233-235), and Vicodin for continued back pain. (R. at 233).

In February 2003, Dr. Vandrak noted joint instability and dysfunction in Plaintiff's lower back. (R. at 231-32). Additionally, he noted continued pain and situational depression. (R.at

---

[1]

*Dr. Vandrak is a physiatrist (also referred to as a physical medicine and rehabilitation specialist), which is a board certified physician specializing in physical medicine or the treatment, prevention and diagnosis of disease by physical means, including manipulation, massage and exercise. See* http://www.webmd.com/pain-management/doctors-who-treat-pain, last visited September 3, 2009. Many physiatrists specialize in pain management. *Id.* According to the website of the American Academy of Physical Medicine and Rehabilitation, physiatrists commonly treat chronic pain syndromes such as low back pain, chronic pelvic pain and fibromyalgia, with a goal of restoring a patient's daily functional abilities. *See* http://www.aapmr.org/condtreat.htm, last visited September 3, 2009.

231).  The records indicate that plaintiff, on physical exam, had moderate limitations in lumbar flexibility. (R. at 232).  He likewise noted tenderness in the joints of her low back and difficulty, resistence and altered gait due to pain. (*Id.*). Dr. Vandrak prescribed Vicodin and recommended an exercise program. (R. at 231).  He also made a note that he was "leaning toward disability." (*Id.*).

On May 23, 2003, Dr. Vandrak conducted a multiple trigger points test for fibromyalgia, and indicated a positive diagnosis. (R. at 228). Additionally, he again noted that Plaintiff suffered from ongoing chronic pain, situational depression and sleep disturbance. (*Id.*).  He discussed better pain management, including pilates, home exercise and the use of pain medication. (*Id.*).

In January 2004, Dr. Vandrak's notes indicate a diagnosis of irritable bowel syndrome. (R. at 224).  Dr. Vandrak ruled out, however, that Plaintiff's pain was associated with irritable bowel and gynecological problems. (*Id.*).  He recommended a chiropractor and noted the need to address pain management. (*Id.*).  Plaintiff was seen again in February 2004 for back pain. (R. at 242).  Images of her ribs and spine showed no evidence of abnormal activity. (*Id.*).

In April 2004, Dr. Vandrak saw Plaintiff with complaints of chronic pelvic pain, low back pain, fibromyalgia and irritable bowel syndrome. (R. at 222).  He noted that Plaintiff had complaints of episodes of bloating as a result of the irritable bowel syndrome. (*Id.*).  In June 2004, Dr. Vandrak saw Plaintiff again with complaints of chronic pelvic pain, constant diarrhea and constipation. (R. at 220).  She was sent for a urologic consult. (R. at 221).

Plaintiff was seen by Dr. Vandrak on January 20, 2005. (R. at 333).  At this time, he noted possible colitis, a history of irritable bowel syndrome, a history of polycystic ovarian disease, chronic pelvic pain, back pain and joint dysfunction. (*Id.*).  He also noted a diagnosis of fibromyalgia. (*Id.*).  Records from April and July 2004 indicate that plaintiff saw Dr. Vandrak for complaints of pain in the lumbar spine and irritable bowel syndrome. (R. at 330-32).  On June 19, 2005, Plaintiff had an MRI and radiographs of the lumbar spine, which were normal. (R. at 334-35).

In November 2005, Dr. Vandrak prescribed Plaintiff Roxicodone for pain. (R. at 329). At that visit, he noted that Plaintiff had pelvic pain, pain in her tailbone, inflamation of the joints in the lower spine, irritable bowel syndrome with colitis and a recent rupture of an ovarian cyst. (*Id.*). In January 2006, records from follow-up with Dr. Vandrak indicate that Plaintiff was to continue with Restoril for sleep and Roxicodone for pain control. (R. at 328).  Additionally, he prescribed a Medrol Dose pack. (*Id.*).  In March and June 2006, Plaintiff saw Dr. Vandrak for follow up for pelvic pain,  pain in the tail-bone and irritable bowel. (R. at 327-28).  In December 2006, Plaintiff continued to be treated for polycystic ovary disease, colitis with irritable bowel syndrome and fibromyalgia with  Restoril for improved sleep, Oxycodone for pain and Xanax for anxiety. (R. at 325).

In January 2006 Plaintiff saw Dr. Vandrak with continued complaints of persistent pain. (R. at 328).  Dr. Vandrak noted that Plaintiff had irritable bowel syndrome and colitis, as well as a history of endometriosis and ovarian cysts. (*Id.*).  He discussed proper use of pain medication and prescribed a Medrol Dose Pack. (*Id.*).

### Lawrence County Family Medicine

In March 2002, Plaintiff was seen at Lawrence County Family Medicine for chronic lumbar pain and possible thoracic strain. (R. at 269).  She was prescribed Vicodin and Celebrex for pain, and it was suggested that she use a Medrol Dose Pack and moist compresses for back pain. (*Id.*). She was seen again in October 2002 with complaints of chronic lumbar pain, painful urination, cigarette use and depression. (R. at 268).   The records indicate that Plaintiff had previously been tried on Lexepro for depression and Topomax and Baclofen for chronic pain. (*Id.*). On this date, she was prescribed Wellbutrin for depression, as well. (*Id.*).

Records from June 2003 indicate that Plaintiff was diagnosed with chronic lumbar and pelvic pain, as well as fibromyalgia and periods of anxiety and depression. (R. at 267).   She was given a prescription for Xanax for anxiety. (*Id.*).  Plaintiff was seen again twice in November 2003 with complaints of chronic back pain. (R. at 258).  She was advised to go to the emergency room if pain was severe. (R. at 264).  On July 16, 2004, she was seen for chronic intermittent

abdominal pain and bloating and chronic back pain. (R. at 259).  It was recommended that she follow up with a gynecologist and Dr. Vandrak for pain management. (*Id.*).

### Jameson Rehabilitation Center

Plaintiff was referred to Jameson Rehabilitation Center for physical therapy by Dr. Vandrak in March 2003. (R. at 81).  Records from an evaluation done on March 4, 2003 indicate that Plaintiff had complaints of constant low back pin on both sides and pain in both hips. (R. at 83).  The records indicate a pain rating of 10 on a scale of 10 with prolonged sitting and ambulation. (*Id.*).  They also indicate that Plaintiff had limited back and hip strength, affected by ambulation and sitting. (*Id.*).  The evaluating therapist noted a mild abnormal gait and limited mobility in Plaintiff's back (R. at 84).  Plaintiff received physical therapy several times in the month of March 2003. (R. at 82-83).  The records from her final therapy appointment show that her gait appeared normal, as did her speed and aptitude. (R. at 82).

### Dr. Joseph Ciocca

Plaintiff was seen by an ob/gyn, Dr. Joseph Ciocca, on April 2004 with complaints of mood swings, night sweats, bloatedness and weight gain. (R. at 251).  Her lab tests were normal. (R.at 253).  She was seen again on June 23, 2004 with complaints of severe pelvic pain, bloating, diarrhea, frequent urination and cramps and pressure in her low back. (R. at 250).  Lab tests on this date were also normal. (*Id.*).  Plaintiff was prescribed Provera for abnormal bleeding. (*Id.*).

### Dr. Ronald Cramer

Plaintiff was referred to a gastroenterologist, Dr. Ronald Cramer, in February 2006. (R. at 342).  On examination, he noted that Plaintiff suffered from left lower quadrant pain, abdominal discomfort and excessive bloating. (R. at 343).  Plaintiff had an upper endoscopy performed in February 2006, which was normal. (R. at 338).  In March 2006, Plaintiff followed up with Dr. Cramer, who indicated that Plaintiff had irritable bowel syndrome. (R. at 341).  He recommended a food plan and regular exercise. (*Id.*).

## IV.  STANDARD OF REVIEW

The standard of review in a social security case is whether substantial evidence exists in the record to support the Commissioner's opinion. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence has been defined as "more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Additionally, if the Commissioner's findings of fact are supported by substantial evidence, they must be accepted as conclusive. 42 U.S.C. §405(g); *Dobrowlsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In making this determination, the district court considers and reviews only those findings upon which the ALJ based the decision, and cannot rectify errors, omissions or gaps therein by supplying additional facts from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ. *Fargnoli v. Massanari*, 247 F.3d 34, 44 n. 7 (3d Cir. 2001).

## IV.   DISCUSSION

Under the Social Security Act, an individual is considered disabled when she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months. ...

42 U.S.C. §§416(i)(1)(A); 423(d)(1)(A); 20 C.F.R. §404.1505. A person is unable to engage in substantial gainful activity when she:

> is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work. ...

42 U.S.C. §423(d)(2)(A).

When resolving the issue of whether a claimant is disabled within the meaning of the Social Security Act, the Commissioner utilizes a five-step sequential evaluation process. 20 C.F.R. §404.1520. The process is summarized as follows:

> If at any step of a finding of non-disability can be made, the [Commissioner] will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that [she] is not working at a "substantial gainful activity." §§404.1520(b), 416.920(b).  At step two, the [Commissioner] will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment of combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities. §§404.1520©, 416.920©.   At step three, the agency determined whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§404.1520(d), 416.920(d).  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the [Commissioner] assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the [Commissioner] to consider so-called "vocational factors" (the claimant's age, education and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.    §§404.1520(f), 404.1560©, 416.920(f), 416.960©.

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

Plaintiff's motion challenges the ALJ's determination at steps four and five of the sequential evaluation process. (Doc. No. 10 at 5-6). In particular, Plaintiff challenges the ALJ's determination that Plaintiff has the residual functional capacity to return to past relevant work as a printer space designer or to perform other jobs that exist in the national economy.

At step four of the sequential evaluation process, the ALJ first determined that Plaintiff had the residual functional capacity to perform light work, with the additional limitations that she have a sit/stand option, that she only be required to do occasional climbing, balancing, crouching, stooping, kneeling and occasionally perform fine manipulation with her hands and fingers. (R. at 20). In making this determination, the ALJ considered Plaintiff's testimony at the administrative hearing, as well as her medical records, Dr. Vandrak's medical source statement and the determination of the Disability Determination Service. (R. at 21). The ALJ found that, comparing Plaintiff's residual functional capacity with the physical and mental demands of Plaintiff's past work as a printer space designer, as she described it, Plaintiff is capable of performing said work. (R. at 22).

Moreover, the ALJ found at step five that, even if claimant were not capable of returning to her past relevant work. (Doc. No. 22).  In making this determination, the ALJ noted the

testimony of the vocational expert testified that there are jobs that exist in the national economy that Plaintiff could perform, given Plaintiff's residual functional capacity and functional limitations. (R. at 22).

In making his residual functional capacity determination, the ALJ specifically analyzed each of the impairments that he found severe under step two of the sequential evaluation process and determined that none of these impairments or combination of impairments credibly caused the intensity, persistence and limiting effects noted by either Plaintiff or by Dr. Vandrak in his medical source statement. (R. at 21).  Rather, the ALJ found the opinion of the Disability Determination Services medical consultant that Plaintiff to be worth of substantial probative weight. (*Id.*).

Plaintiff's motion for summary judgment raises several issues in regard to the ALJ's residual functional capacity determination. First, Plaintiff contends that the determination of the ALJ is not supported by substantial evidence because the ALJ failed to properly consider the reports of Plaintiff's treating physician, Dr. Vandrak.  Specifically, Plaintiff argues that, when the medical source statement provided by Dr. Vandrak "is read together with the treating records supplied" by him, "the basis for Dr. Vandrak's findings is clear and unequivocal." (Docket. No. 10 at 4). Furthermore, Plaintiff argues that the ALJ erred in determining that Plaintiff's testimony regarding her functional limitations was not entirely credible because her complaints are supported by the objective medical evidence provided by Dr. Vandrak. (Docket No. 10 at 5). Specifically, Plaintiff argues that, while the ALJ determined that Plaintiff's complaints regarding irritable bowel syndrome, carpal tunnel syndrome and fibromyalgia are not supported by the objective medical evidence, records from Dr. Vandrak support her testimony and should have been given substantial weight. (Docket No. 10 at 6).  For the following reasons, the Court finds that the ALJ failed to give proper weight to Dr. Vandrak's ultimate opinions as to Plaintiff's physical limitations.  Furthermore, because the ALJ failed to specifically discuss the medical records provided by Dr. Vandrak and merely summarily stated that Dr. Vandrak's medical source statement is not supported by said records, the Court is without a sufficient basis to

determine which records the ALJ relied upon and which he discounted in making his findings. Therefore, for the reasons set forth below, the Court finds that remand is appropriate.

> A.    Whether the ALJ Gave Proper Weight to the Opinions
>         of Plaintiff's Treating Physician, Dr. Vandrak

Plaintiff's first argument in regard to the ALJ's residual functional capacity determination is that the ALJ failed to properly consider all of the medical evidence provided by Plaintiff's treating physician, Dr. Vandrak.  Plaintiff argues that "[i]t would appear that the ALJ rejected the opinions of Plaintiff's treating physician, [Dr. Vandrak], based solely on the medical source statement submitted by Dr. Vandrak, without considering the medical record of Dr. Vandrak submitted both prior to and after the hearing." (Docket No. 10 at 6).

At step four of the sequential evaluation process, the ALJ must determine whether the claimant maintains the residual functional capacity to perform past relevant work. 20 C.F.R. §404.1520(e).  Residual functional capacity refers to "'that which an individual is still able to do despite the limitations caused be her impairments.'" *Burnett v. Commissioner of Social Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). *See also* 20 C.F.R. §404.1545(a).  While the Plaintiff bears the burden of demonstrating at this step that she is unable to return to her past relevant work, *Id.* at 118 (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)), the ALJ is required to consider all of the evidence before him in making a residual functional capacity determination. *Id.* at 121 (citing *Plummer*, 186 F.3d at 429; *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986)).  "'In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Id.* (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

In making a residual functional capacity determination, the ALJ is required to "consider, discuss and weigh relevant medical evidence." *Fargnoli*, 247 F.3d at 42 (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 406-07 (3d Cir. 1979)).  The ALJ may not make "speculative inferences" from the medical reports, *Plummer*, 186 F.3d at 429 (citing, *e.g.*, *Smith v. Califano*, 736 F.2d 968, 972 (3d Cir. 1981)), nor may an ALJ his "own expertise against that of a physician

who presents competent medical evidence." *Id.* (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)).

Moreover, "when a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Id.* (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). Indeed, where there is "conflicting probative evidence in the record" the ALJ is required to give an explanation of the reasoning behind his conclusions, or remand will be appropriate. *Fargnoli*, 247 F.3d at 42 (citing *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981)). *See also Adorno v. Shalala*, 40 F. 3d 43, 48 (3d Cir. 1994) (citations omitted) (holding that, an ALJ must "explicitly weigh all relevant, probative and available evidence ... [and] must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition ...").

When considering the medical opinions of a treating physician in particular, the United States Court of Appeals for the Third Circuit subscribes to the "treating physician doctrine," which requires that "a court considering a claim for disability benefits ... give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d cir. 1993); *Fargnoli*, 247 F.3d at 43 (citing 20 C.F.R. §404.1527(d)(2); *Cotter*, 642 F.2d at 704) (holding that, "[u]nder applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight"). A treating physician's opinion will be afforded "great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the [claimant's] condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer*, 186 F.3d at 429) (citations omitted). A treating physician's opinions will be accorded *controlling* weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Fargnoli*, 247 F.3d at 42.

An ALJ may reject a treating physician's opinions entirely, as was the case here, but must do so only where there is contradictory medical evidence. *Morales*, 225 F.3d at 318. The

Court of Appeals has held that, where there is contradictory medical evidence, the ALJ may reject a treating physician's opinion outright "'only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.'" *Id.* (quoting *Plummer*, 186 F.3d at 429) (citations omitted); 42 U.S.C. §423(d)(1)(A). Additionally, an ALJ may reject a treating physician's opinion outright if it is not supported by sufficient clinical data. *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985).

While "a statement by a [claimant's] treating physician supporting an assertion that she is 'disabled' or 'unable to work' is not dispositive of the issue," *Adorno v. Shalala*, 40 F.3d 43, 47-48 (3d Cir. 1994) (citing *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990)), "the ALJ must weight the relative worth of a treating physician's report against the reports submitted by other physicians who have examined the claimant." *Id.* (citations omitted). An ALJ may afford such an opinion less weight, "depending on the extent to which supporting explanations are provided." *Plummer*, 486 F.3d at 429 (citing *Newhouse v. Heckler*, 753 F.2d 283, 286)). Indeed, form reports are weak evidence, and should not be afforded the same weight as actual medical evidence. *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). The determination of whether a claimant is disabled or not disabled is a determination for the ALJ. 20 C.F.R. §404.1527(d)(2), 416.927(d)(2). *See Rannard v. Astrue*, Civil Action No. 08-1747, 2009 WL 1974295 at *8 (W.D. Pa. July 7, 2009) (noting that "[a] medical statement or opinion by a treating source on a matter reserved for the Commissioner" is not dispositive or controlling).

However, the Regulations distinguish these types of opinions, *i.e.*, those which require dispositive administrative findings, such as the opinion that a claimant is disabled, and medical opinions of a treating physician regarding the nature and severity of a claimant's impairments, symptoms, diagnoses and prognoses and physical or mental limitations. *See* 20 C.F.R. §404.1527(e). *See also Schwartz v. Halter*, 134 F.Supp. 2d 640, 650 (E.D. Pa. 2001) (holding that a physician's assessment of a claimant's abilities and limitations are considered to be medical opinions to be given substantial weight and are not the same as opinions reserved to the Commissioner, such as an opinion that the claimant is disabled).

In this case, Dr. Vandrak completed a medical source statement of Plaintiff's ability to do work-related physical activities on January 22, 2007. (R. at 372-374).   He opined the following in regard to Plaintiff's exertional limitations: (1) she would be able to occasionally lift and/or carry three to five pounds or less; (2) she would not be able to frequently lift and/or carry any amount of weight; (3) she would be able to stand and/or walk less than two hours in an eight-hour workday; (4) she would be able to sit less than two hours total; and (5) pushing and/or pulling would be limited in her upper and lower extremities.  (R. at 372).  In regard to these limitations and in response to "What medical/ clinical findings support your conclusions ...," Dr. Vandrak stated: "seen in my office numerous times," "physical exam," "medication requirements." (*Id.*).  In regard to Plaintiff's postural limitations, Dr. Vandrak opined that  her impairments would prevent her from ever climbing, balancing, kneeling, crouching, crawling and stooping. (*Id.*).  Dr. Vandrak did not note any specific medical or clinical findings to support this conclusion. (*Id.*).  Additionally, in regard to manipulative limitations, Dr. Vandrak indicated that Plaintiff is limited in reaching, gross manipulation and fine manipulation, but indicated no specific medical or clinical findings to support this conclusion. (R. at 373).  Finally, in regard to environmental limitations, Dr. Vandrak opined that Plaintiff would be limited in her ability to tolerate temperature extremes, humidity and wetness and hazards. (R. at 374).  Again, however, Dr. Vandrak left blank the section on specific medical and/or clinical findings to support these conclusion. (*Id.*).

Because Dr. Vandrak's medical source statement was an assessment of her limitations and capabilities based on his treatment of Plaintiff, they are medical opinions that are to be afforded significant weight. See 20 C.F.R. §404.1527(e); *Schwartz*, 134 F.supp. 2d at 650. However, the ALJ declined to give any weight to Dr. Vandrak's conclusions in the medical source statement.  In rejecting Dr. Vandrak's statement, the ALJ made the following findings:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. With regard to [irritable bowel syndrome], testing revealed neither abnormalities nor any functional limitations from it ... . Her testimony was not supported by medical records.  With regard to carpal tunnel syndrome, the

claimant reported that Dr. Vandrak treated her for it, but there is neither reference to it nor any treatment for it in the medical record. There is no clinical correlation in any of Dr. Vandrak's records of fibromyalgia. In addition, she has had neither surgery nor been advised that she is a surgical candidate. Her treatment has been only conservative in nature. Objective diagnostic testing, such as the MRI done of her lumbar spine of June 9, 2005, was normal ... . There is no evidence of disc herniation or nerve root impingement. There are not signs of muscle atrophy, indicating that she moves around in a fairly normal manner. Based on the above, I reject the findings of the medical source statement made by Dr. Vandrak, that the claimant was extremely limited to less than the full range of sedentary work, as it is totally unsupported by his outpatient records — merely writing "seen in my office numerous times," "physical exam," and "medication requirements" is an insufficient basis for his findings ... .

The Disability Determination Service (DDS) medical consultant found that the claimant could do  light work. I find this DDS assessment to be generally consistent with the evidence of record and worthy of substantial probative weight ... .

(R. at 21).

The Court finds that the ALJ's explanations for refusing to give Dr. Vandrak's opinions any weight are inadequate and as a result cannot ascertain the basis of the ALJ's opinion from the record. The ALJ was not permitted to reject Dr. Vandrak's opinions in their entirety without either citing to specific contradictory medical opinions or unless said opinions were unsupported by sufficient clinical evidence. *See Morales*, 225 F.3d at 318 and *Newhouse*, 753 F.2d at 286. It appears here that the ALJ found that Dr. Vandrak's opinions were not sufficiently supported by clinical data. However, the Court finds that, at least in regard to Plaintiff's complaints of fibromyalgia, the ALJ failed to give an adequate evaluation of Dr. Vandrak's opinions in light of his treatment records. In regard to Plaintiff's fibromyalgia, the ALJ gave merely a one sentence conclusion that Plaintiff was not severely limited as a result of the impairment. Specifically, in regard to the limiting effects of Plaintiff's fibromyalgia symptoms, the ALJ states only that "[t]here is no clinical correlation in any of Dr. Vandrak's records of fibromyalgia." (R. at 21). The ALJ fails, however, to give specific reasons for finding that there was no clinical correlation of fibromyalgia in Dr. Vandrak's records. Because the ALJ gives no more explanation than this one sentence, the Court cannot determine which of Dr. Vandrak's records were considered when

making this determination, and why the ALJ made said finding, especially considering the many references to a diagnosis of fibromyalgia in Dr. Vandrak's treatment notes.[2]

Furthermore, while the Court does agree with the Commissioner that Dr. Vandrak's medical source statement fails to specify what clinical findings support his determination in regard to Plaintiff's limitations, his statements nonetheless reflect his opinion, based on his treatment of Plaintiff over many years, that she is severely limited as a result of her impairments. Instead of seeking clarification of Dr. Vandrak's opinions regarding Plaintiff's limitations, the

---

[2] Fibromyalgia syndrome is "a common and chronic disorder characterized by widespread pain, diffuse tenderness, and a number of other symptoms." National Institute of Arthritis and Musculoskeletal Diseases, http://www.niams.nih.gov/Health_Info/Fibromyalgia/default.asp (last visited September 3, 2009). It is diagnosed based on criteria established by the American College of Rheumatology, including a "history of widespread musculoskeletal pain present for at least 3 months and the demonstration of significant tenderness or pain in at least 11 of the 18 tender point sites on digital palpitation. ... Some patients have fewer tender sites and more regional pain and may be considered to have fibromyalgia." HARRISON'S PRINCIPLES OF INTERNAL MEDICINE, 17TH ED. 2176 (Anthony S. Fauci, et al. eds., 2008) (1958). In addition to widespread musculoskeletal pain, "[d]isorders commonly associated with fibromyalgia include irritable bowel syndrome, irritable bladder, headaches (including migraine headaches), dysmenorrhea, premenstrual syndrome, restless leg syndrome, temporaromandibular joint pain, noncardiac chest pain, Raynaud's phenomenon, and sicca syndrome." Id. The prognosis for most individuals with fibromyalgia is poor. Id. Moreover, "[s]ymptoms wax and wane in some patients, while in other pain and fatigue are persistent regardless of therapy." Id. Considering the information the Court has in regard to the symptoms and treatment of fibromyalgia, the ALJ's conclusion that there is no clinical correlation in the medical records of fibromyalgia without further explanation fails to adequately consider Dr. Vandrak's opinions related to fibromyalgia. Rather, records from Dr. Vandrak as well as Plaintiff's various other treating physicians indicate that she had and was treated for various symptoms of chronic pain and other ailments associated with the disease.

Treatment records from Dr. Vandrak indicate that he treated Plaintiff for symptoms of fibromyalgia over the course of several years. According to these records, Plaintiff had multiple trigger points, as well as chronic pain in her back and pelvis, sleep disturbance, irritable bowel syndrome and symptoms of anxiety and depression. She was prescribed pain medication, sleep aid and anxiety medication. She was also counseled on pain management, good sleep hygiene and exercise. (R. at 218-240). In addition to treatment records from Dr. Vandrak, Plaintiff's treating physicians at Lawrence County Medicine and Dr. Ronald Cramer also note a diagnosis of fibromyalgia and treatment for chronic pain, sleep disturbance, migraine headaches and irritable bowel syndrome. (R. at 259-269; R. at 342-348).

ALJ determined that none of the impairments that he found to be severe impairments at step two could cause such limiting effects, but again, with no explanation of conflicting medical opinions and with an inadequate determination that Dr. Vandrak's opinions were not supported by his treatment notes. Treatment notes from Dr. Vandrak indicate that as early as 2003 he was of the opinion that Plaintiff was unable to work as a result of her various impairments. (R. at 231). While a disability determination is one reserved for the Commissioner, *Adorno*, 40 F.2d at 47-48, considering Dr. Vandrak's statements in his treatment notes that Plaintiff was becoming disabled in light of his medical opinions, including his medical source statement, the Court finds that the ALJ erred by failing to adequately evaluate these opinions before rejecting them entirely. *See Gonzalez v. Astrue*, 537 F.Supp. 2d 644, 660 (D.Del. 2008) (citing Social Security Fuling 96-2p, 1996 WL 374188 at *4 (July 2, 1996) (holding that, "[a]judicators must remember that a finding that a treating source medical opinion is … inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. … In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight").  On remand, further evaluation of Dr. Vandrak's opinions are warranted and may require that Dr. Vandrak be recontacted for clarification of his reasons for his opinions in the medical source statement.  *See e.g. Foley v. Barnhart*, 432 F.Supp. 2d 465, 479 n. 8 (M.D. Pa. 2005) (citing Social Security Ruling 96-5p;20 C.F.R. §404.1512(e)) (holding that "[u]pon remand, this may be a case where the only way for the ALJ to determine the basis of the treating physician's opinion is to recontact [the physician]").[3]

---

The Court notes that the Commissioner argues that Dr. Vandrak's opinion should not

[3]

have been afforded greater weight because his opinions were inconsistent with Plaintiff's own testimony regarding her functional abilities. (Doc. No. 12 at 10).  However, as discussed above, an ALJ may only reject a treating physician's opinions outright based on contradictory medical evidence or where it is unsupported by sufficient clinical data.  *See Morales*, 225 F.3d at 318; *Newhouse*, 753 F.2d at 286.  Moreover, as discussed *infra*, it is not entirely clear to this Court that the Plaintiff's subjective complaints of pain were entirely inconsistent with Dr. Vandrak's opinions.

B.      Whether the ALJ Gave Proper Weight to Plaintiff's Subjective Complaints

Plaintiff also argues that the ALJ erred in determining Plaintiff's residual functional capacity, insofar as he failed to give her testimony regarding her subjective complaints of pain and limitations proper weight. (Docket No. 10 at 6).  Specifically, Plaintiff argues that, when considered in light of Dr. Vandrak's opinions, her complaints are supported by substantial medical evidence and should not have been rejected. (*Id.*).

In addition to the record medical evidence, in making a residual functional capacity determination, an ALJ is required to "give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)).  *See also Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002). Furthermore, the ALJ must "give great weight to a claimant's subjective testimony of the inability to perform even light or sedentary work when this testimony is supported by competent medical evidence." *Schaudeck v. Commissioner of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999) (citing *Dobrowolsky*, 606 F.2d at 409)). However, the ALJ may reject a claimant's testimony regarding her limitations and subjective complaints of pain if he does not find them credible. *Powell v. Barnhart*, 437 F.Supp. 2d 340, 342 (E.D. Pa. 2006) (citing *Schaudeck*, 181 F.3d at 433).  *See also Hischfield v. Apfel*, 159 F.Supp. 2d 802, 811 (E.D. Pa. 2001) (citations omitted). "If supported by substantial evidence, the ALJ's credibility findings may not be disturbed on appeal."  *Hirschfield*, 159 F.Supp. 2d at 811 (citing *Van Horn v. Schweiker*, 717 F.2d 871 (3d Cir. 1983); *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981); and *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974)).

The Court finds that, in light of the ALJ's failure to properly consider the opinions of Plaintiff's treating physician, Dr. Vandrak, his finding that Plaintiff's subjective complaints of pain are not credible  is not supported by substantial evidence and should be reconsidered on remand in light of his findings relative to Dr. Vandrak's opinions.  *See Gonzalez*, 537 F.Supp. 2d at 665-66; *Schwartz v. Halter*, 134 F.supp. 2d 640,  655 (E.D. Pa. 2001) (noting that, had the

ALJ given the claimant's treating physicians opinions credit, his analysis of the claimant's subjective complaints might have been significantly different and vice versa).

      C.    Whether the ALJ's Determination at Step Five of
          the Sequential Evaluation Process is Supported by Substantial Evidence

Finally, Plaintiff argues that the ALJ's alternative finding, that at step five Plaintiff is capable of performing work that exists in the national economy, is not supported by substantial evidence. (Docket No. 10 at 7).  Specifically, Plaintiff argues that said determination is not supported by substantial evidence because the vocational expert testified that an individual with Plaintiff's limitations would be unable to work at a light exertional level. (*Id.*).  Because this issue turns on whether the ALJ properly determined Plaintiff's residual functional capacity and the Court finds (as discussed above) that remand is appropriate for reconsideration of Plaintiff's residual functional capacity with proper consideration of Dr. Vandrak's opinions, the ALJ should reconsider his determination at step five consistent with his residual functional capacity determination.

## V.    CONCLUSION

Based on the foregoing, the Court finds that the ALJ erred in failing to properly evaluate the opinions of Plaintiff's treating physician, Dr. Vandrak and, therefore, the decision of the Commissioner is not supported by substantial evidence. Therefore, this case will be remanded to the ALJ for further consideration consistent with this opinion.


                                 s/ David Stewart Cercone
                                 David Stewart Cercone
                                 United States District Judge

cc:    Norman J. Barilla, Esquire
       Barilla Shaw
       111 West Sheridan Avenue
       New Castle, PA 16105

       Paul Kovac, AUSA
       United States Attorney's Office
       Suite 4000
       U.S. Post Office and Courthouse
       700 Grant Street
       Pittsburgh, PA 15219